**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **FASTSIGNS INTERNATIONAL, INC.,** | |
| **Plaintiff,** | **Case No.:** |
| **v.** | |
| **HASSAN BROTHERS LLC, RUBY SIGNS LLC, FAISAL HASSAN, and SAIF HASSAN** | |
| **Defendants.** | |

## COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff FASTSIGNS International, Inc. ("FASTSIGNS"), by its attorneys, and for its Complaint for Preliminary Injunctive Relief against Hassan Brothers LLC, Ruby Signs LLC, Faisal Hassan, and Saif Hassan, states as follows:

### INTRODUCTION

1.     FASTSIGNS is the national franchisor of the FASTSIGNS® network of franchised sign centers operating throughout the country. Defendant Faisal Hassan, through his entity Hassan Brothers LLC, is the franchisee and personal guarantor of a FASTSIGNS® center in Cypress, Texas.

2.     Despite agreeing to (i) accurately report the center's gross sales; (ii) maintain the confidentiality of FASTSIGNS' trade secrets and confidential information provided to him under the franchise agreement; (iii) not engage in any competitive business during the franchise agreement's term and for a reasonable period after termination; and (iv) not engage in any activity which might injure the goodwill of the FASTSIGNS trademarks and franchise system, Faisal Hassan has schemed with defendant Saif Hassan, his brother, and defendant Ruby Signs LLC,

another entity he controls, to create a competitive sign business that operates under the name "Ruby Signs" and misappropriates FASTSIGNS trade secrets and confidential information, including its customer information, to steal clients from FASTSIGNS and service those clients under a sham business that neither reports sales nor pays royalty and other fees owed on those sales to FASTSIGNS.

3.     After discovering and confirming this scheme through its own investigation, FASTSIGNS has (i) terminated the franchise agreement for cause and (ii) initiated an arbitration demand in accordance with the franchise agreement's mandatory arbitration provision, seeking damages and permanent injunctive relief.

4.     FASTSIGNS brings this lawsuit under the arbitration provision's carveout for preliminary injunctive relief and asks this Court to issue a preliminary injunction (i) enjoining defendants from their continuing misappropriation of FASTSIGNS' trade secrets and confidential information in violation of federal and state trade secret protection statutes; (ii) ordering defendants to comply with the franchise agreement's and personal guarantee's confidentiality obligation by ceasing to use any aspects of FASTSIGNS' proprietary system in the operation of a competitive business; and (iii) ordering defendants to comply with the franchise agreement's and personal guarantee's noncompetition covenant by ceasing to engage in any competitive business within fifteen miles of the center's former location or any other FASTSIGNS® center.

## PARTIES

5.     Plaintiff FASTSIGNS International, Inc. ("FASTSIGNS") is a Texas corporation with its principal place of business at 2542 Highlander Way, Carrollton, Texas 75006.

6.     Defendant Hassan Brothers LLC ("Hassan Brothers") is a Texas limited liability company with its principal place of business at 22220 Northwest Fwy., Ste. C, Cypress, Texas

77429.

7.     Defendant Ruby Signs LLC ("Ruby Signs") is a recently formed Texas limited liability company with its principal place of business at 11330 Brittmoore Park Drive, No. D, Houston, Texas 77041.

8.     Defendant Faisal Hassan ("Faisal") is a citizen and resident of Texas who resides at 606 Sugar Creek Blvd, Sugar Land, Texas 77478. Faisal was previously the sole member of Hassan Brothers, but recent filings show that defendant Saif Hassan now also owns a membership interest in Hassan Brothers.

9.     Defendant Saif Hassan ("Saif") is a citizen and resident of Texas who also resides at 606 Sugar Creek Blvd, Sugar Land, Texas 77478. He is Faisal's brother.

**JURISDICTION AND VENUE**

10.     The Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367 because this is a civil action involving claims arising under the laws of the United States and the remaining other claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

12.     Jurisdiction and venue are also proper in this judicial district because defendants expressly agreed in writing in the franchise agreement and its personal guarantee that any action between the parties would be brought exclusively in this Court, and they irrevocably consented, and waived any objection, to jurisdiction of and venue in this Court.

**RELEVANT FACTS**

13.     FASTSIGNS is the national franchisor of the nearly 700 FASTSIGNS® centers operating throughout the country, including Texas.

14.     FASTSIGNS has developed a system and franchising opportunity for the operation of centers specializing in the selling, marketing, producing, installing, and repairing of visual communications including signs (both non-electrical and electrical), related work involved in the maintenance, installation, and de-installation of interior and exterior signage, including painting, patching, masonry and landscaping, graphics, banners, flags, vehicle graphics, vehicle wraps, ADA signage, compliance signs, dimensional letters, dimensional signage, ready-to-apply lettering, decals and labels, exhibits, trade show and other displays, digital imaging, printing (including small format, large format, grand format and 3D), textile and fabric printing, advertising and promotional products (including wearables), electronic and digital signage, content for digital signage, visual graphics enhanced by 2D barcodes, radio frequency identification, augmented reality and virtual reality, QR codes, websites (both regular and mobile-optimized), logo and artwork design and illustration, product wraps and other related graphics, marketing services, and complementary products and services.

15.     FASTSIGNS grants franchises to qualified candidates to establish and operate FASTSIGNS® centers under written franchise agreements with FASTSIGNS, together with a limited license to use FASTSIGNS' proprietary system and certain FASTSIGNS' trademarks in connection with the operation of those centers (the "Marks").

16.     FASTSIGNS owns the Marks and certain intellectual property, including copyrights, trade secrets, trade dress, and other proprietary information used in the development

4

and operation of centers that operate under and provide products and services identified by the Marks.

17.      Hassan Brothers and Faisal, as franchisees of FASTSIGNS, had access to, and agreed to maintain the confidentiality of, FASTSIGNS' trade secrets and confidential information, including without limitation site selection criteria; training and operations materials and manuals; methods, format, specifications, standards, systems, procedures, production techniques, production processes, sales and marketing techniques, knowledge, and experience used in developing and operating FASTSIGNS centers; sales, marketing, and advertising programs; knowledge of, specifications for, and suppliers of operating assets and other products and supplies; proprietary computer software or similar technology, including data, reports, and other printed materials generated by such software and technology; knowledge of the operating results and financial performance of other FASTSIGNS centers; graphic designs, icon designs, and related intellectual property; and personal information of any customers of FASTSIGNS centers (collectively "Trade Secrets and Confidential Information").

18.      FASTSIGNS' Trade Secrets and Confidential Information are not generally known in the industry, and FASTSIGNS derives economic value and a competitive advantage in the marketplace from their secrecy.

19.      FASTSIGNS has invested substantial sums of money and time researching and developing its Trade Secrets and Confidential Information.

20.      FASTSIGNS maintains the confidentiality of its Trade Secrets and Confidential Information by disclosing such information to authorized franchisees under written franchise agreements with confidentiality obligations; restricting access on a need-to-know basis; and storing the information on password-protected computers and network platforms.

21.     FASTSIGNS also protects access to its Trade Secrets and Confidential Information by requiring authorized franchisees to agree to reasonable in-term and post-termination noncompetition covenants that prohibit franchisees and their principals and guarantors from having a direct or indirect interest in competitive centers that offer similar products and services.

**A.     Defendants acquire an existing FASTSIGNS® center and enter into a franchise agreement with FASTSIGNS.**

22.     In August 2021, Faisal applied to become a FASTSIGNS franchisee in connection with the acquisition of an existing FASTSIGNS® center at 22220 Northwest Fwy., Ste. C, Cypress, Texas 77429 (the "Center") from the prior franchisee owner of that center.

23.     Faisal's application lists Saif as a "business partner," and Saif submitted a second application on behalf of himself.

24.     In connection with the potential acquisition of the Center, both Faisal and Saif signed nondisclosure agreements.

25.     FASTSIGNS provided copies of its franchise disclosure document ("FDD") to Faisal and Saif. The FDD, among other things, contains a plain language statement of the franchise offering along with a copy of FASTSIGNS' then-current form franchise agreement.

26.     On or around August 24, 2021, Faisal formed Hassan Brothers, which entered into an agreement to purchase the Center from the former franchisee owner and continue operating it as an authorized FASTSIGNS® center, subject to entering into a new franchise agreement with FASTSIGNS.

27.     Effective October 2, 2021, Hassan Brothers, as franchisee, and FASTSIGNS, as franchisor, entered into a written franchise agreement (the "Franchise Agreement") under which FASTSIGNS granted Hassan Brothers the right to operate the Center for an initial ten-year term.

28.     Despite initially disclosing Saif as a business partner, defendant Faisal represented under the Franchise Agreement that he owned all the membership interest in Hassan Brothers.

29.     Faisal also personally guaranteed Hassan Brothers' obligations under the Franchise Agreement, and agreed to be personally bound by, and personally liable for the breach of, each and every provision of the Franchise Agreement, including the noncompetition covenant discussed below (Hassan Brothers and Faisal are referred to going forward as "Franchisee").

30.     In exchange for the limited license to use FASTSIGNS' proprietary system and operate under its Marks, Franchisee agreed, among other things, to pay FASTSIGNS a continuing service and royalty fee (the "Service Fee") and a cooperative advertising fund contribution (the "Ad Fee" and together with the Service Fee the "Monthly Fees") based on a percentage of the Center's Gross Sales (defined to include all revenue derived from operating the Center excluding taxes).

31.     The Franchise Agreement imposed other obligations on Franchisee relevant to this lawsuit.

32.     Franchisee agreed to an exclusive relationship with FASTSIGNS and also agreed that, during the term of the Franchise Agreement, neither Franchisee nor any of its principals would (i) have any direct or indirect interest in a Competitive Business (defined in the following paragraph); (ii) perform services as a director, officer, manager, employee, consultant, representative, or agent for a Competitive Business; or (iii) divert or attempt to divert any actual or potential business or customer of the Center to a Competitive Business.

33.     The Franchise Agreement defines "Competitive Business" as any business which provides any of the products and services described earlier in paragraph 14.

34.     As an authorized FASTSIGNS® franchisee, Franchisee had access to certain personal information of the Center's customers and the customers of other FASTSIGNS Centers as well as certain national account customers (collectively, "Customer Information"). Under the Franchise Agreement, Franchisee acknowledged that all Customer Information, including information that Franchisee collects from customers of the Center, is exclusively owned by FASTSIGNS. Franchisee expressly agreed that Franchisee, its employees, and its agents could only use the Customer Information in connection with the Center and only while the Franchise Agreement is in effect.

35.     In addition to the Customer Information, Franchisee also had access to other FASTSIGNS' Trade Secrets and Confidential Information. Under the Franchise Agreement, Franchisee acknowledged that it acquired no interest in the Trade Secrets and Confidential Information other than the right to use it in the manner that FASTSIGNS specifies in operating the Center during the Franchise Agreement's term.

36.     Franchisee further agreed (i) not to use FASTSIGNS' Trade Secrets and Confidential Information in any other business; (ii) to keep it confidential; (iii) not to trade or profit from it in any other way; (iv) to adopt reasonable procedures to prevent unauthorized use or disclosure of it; and (v) to require the execution of confidentiality agreements from all key employees who would have access to such information.

37.     Franchisee also agreed that neither it nor its principals would engage in any other activity which might injure the goodwill of the Marks and the franchise system.

38.     And Franchisee agreed not to transfer any non-controlling ownership interest in the franchisee entity without providing FASTSIGNS with written notice of such transfer and

confirming that the proposed transferee meets FASTSIGNS' criteria for franchisee principals (including no ownership interest in or performance of services for a Competitive Business).

39.     The Franchise Agreement authorizes FASTSIGNS to terminate the agreement immediately upon written notice and without an opportunity to cure if Franchisee or its principals defaults under the agreement by, among other things, making any material misrepresentation or omission in acquiring the franchise or operating the Center; engaging in any dishonest or unethical conduct which adversely affects the Center's reputation or the goodwill associated with the Marks; knowingly making any unauthorized use or disclosure of any Trade Secrets and Confidential Information; understating the Center's Gross Sales during the Franchise Agreement's term by more than five percent for any period; making any transfer without complying with the Franchise Agreement's transfer provision; or breaching the terms of the Franchise Agreement on three or more separate occasions within any twelve month consecutive period.

40.     In the event of termination, Franchisee agreed, among other things, to:

a.     immediately de-identify the Center, return materials containing the Marks, cancel all assumed fictitious or assumed names, cease using and authorize the return of any phone number used by the Center, and give FASTSIGNS the usernames and passwords for directory lists and social media accounts for FASTSIGNS to delete or transfer those accounts;

b.     transfer to FASTSIGNS the data that comprises the center management system database and graphic files; and

c.     cease using any Trade Secrets and Confidential Information (including Customer Information) and return such information within fourteen days.

41.    Franchisee and its principals also agreed not to have any direct or indirect interest (e.g. through a family member like a spouse) as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee, consultant, representative, or agent in any Competitive Business located or operating within fifteen miles of the Center (or any other FASTSIGNS® Center) for a period of two years after termination of the agreement or compliance with the noncompetition covenant.

42.    The Franchise Agreement contains a mandatory arbitration provision, which governs all disputes with Franchisee and its principals, guarantors, affiliates, and employees. But the arbitration provision grants the parties the right to seek temporary or preliminary injunctive relief from this Court so long as the dispute is contemporaneously submitted for arbitration.

43.    Franchisee further agreed to pay all costs and expenses, including attorneys' fees, incurred by FASTSIGNS in enforcing its rights under the Franchise Agreement.

**B.    Defendants scheme to steal the Center's clients and underreport sales.**

44.    The Center's sales improved after Franchisee acquired it, and FASTSIGNS looked forward to a long and prosperous relationship with Franchisee.

45.    But after learning how to effectively operate the Center under FASTSIGNS' proprietary system, Faisal, with the help of his brother Saif, devised a scheme to steal the Center's customers for their own new "independent" business, which would operate under the name "Ruby Signs" and avoid paying royalites on sales funneled through that company.

46.    The scheme consisted of two parts. The first was to reduce the Center's sales to their pre-acquisition numbers and then maintain the Center's sales at that level going forward, hoping that constant sales would not arouse any suspicion at FASTSIGNS. The second part was to grow Ruby Signs without paying any Monthly Fees on the sales funneled through that business.

47.    To this end, defendants began diverting larger existing and potential customer accounts to Ruby Signs. Defendants did so regardless of whether the customer was a potential customer, an existing customer (including customers that had been with the Center before Franchisee acquired it), or a national account customer that FASTSIGNS itself had referred to the Center.

48.    For example, defendants would approach certain existing customers and offer to reduce their invoices by up to eight percent—the amount of Monthly Fees owed to FASTSIGNS under the Franchise Agreement—if those customers would convert their accounts to Ruby Signs and not tell anyone.

49.    In other more audacious instances, defendants would switch some existing customer accounts to Ruby Signs without telling the customers, let alone obtaining the customers' consent.

50.    In addition, defendants would divert certain potential customers who approached the Center to Ruby Signs.

51.    In general, if customers needed smaller projects or more traditional printing services, then defendants serviced them through the Center and applied those sales to the minimum level they sought to report to FASTSIGNS.

52.    If, however, customers needed larger projects or sought more expensive services, then defendants would divert them to Ruby Signs and service those accounts through Ruby Signs without reporting those sales to FASTSIGNS.

53.    Ruby Signs, moreover, would not exist without Franchisee's access to FASTSIGNS' proprietary system.

54.     For example, FASTSIGNS' Customer Information is maintained on password-protected computers and network platforms and accessible only by authorized franchisees and employees who are bound by confidentiality agreements which prohibit them from using that information for any unauthorized purpose, like operating a Competitive Business. Ruby Signs would not have been able to ascertain any customer identities, contact information, or the historical service and invoice data for those customers without having access to FASTSIGNS' Customer Information.

55.     In addition, FASTSIGNS' franchisees use a third-party point of sale system ("POS") to estimate and invoice work. FASTSIGNS trains franchisees on its proprietary methods for using the POS to conduct the Center's business.

56.     For the Center's customers, defendants would use the POS to create an estimate. After the customer approved the estimate, defendants would convert the estimate into an invoice. After the work was completed, the customer would pay the invoice, and the POS would report the sale to FASTSIGNS.

57.     For Ruby Signs' customers, defendants would use the Center's same FASTSIGNS POS and proprietary methods to create an estimate. Defendants would then manually convert the estimate to a Ruby Signs invoice by applying a Ruby Signs logo or information and reducing the estimate by up to eight percent. After the work was completed, the customer would pay this invoice from Ruby Signs—which now exists outside the Center's POS—and the sale would never be reported to FASTSIGNS.

58.     In addition, defendants used the same employees at the Center and Ruby Signs, cautioning them not to mention Ruby Signs' existence to anyone at FASTSIGNS.

12

59.     Defendants also purchased trucks and other equipment from FASTSIGNS' approved vendors (taking advantage of FASTSIGNS' discounted pricing terms) and then rebranded those trucks and equipment for Ruby Signs.

60.     Although Faisal instructed the Center's employees and converted customers to keep their knowledge of Ruby Signs in strict confidence, FASTSIGNS has been able to compile a substantial amount of evidence to illuminate defendants' scheme.

61.     Ruby Signs was formed with the Texas Secretary of State in April 2023 under Faisal and Saif's mother's name (Ruby is short for her first name, Rubina).

62.     Ruby Signs operates at 11330 Brittmoore Park Drive, No. D, Houston, Texas 77041, which is an industrial warehouse park less than ten miles from the Center.

63.     The Ruby Signs website, which defendants created shortly after forming the company, advertises numerous pictures of sign work completed by the Center for FASTSIGNS' customers to suggest that those jobs had instead been completed by Ruby Signs.

64.     The Center's sales grew significantly after Franchisee acquired it from the prior franchisee owner. But in 2023, sales growth stalled. And in 2024, the Center's sales have declined such that the Center is now on pace to report annual sales at the same level as the Center reported under the prior franchisee's ownership.

65.     While the Center's sales growth stalled in 2023, the number of open estimates in the Center's POS increased significantly, which is inconsistent with the reported sales volume. These open estimates, which could be used to create invoices for Ruby Signs as described earlier, disproportionately appear for the accounts of the Center's previously large customer accounts.

66.     Indeed, an analysis of the reported sales for the Center's larger customers reveals that those customers began showing more estimated work but less invoiced work in 2023. By 2024,

many of the Center's previously large customer accounts show no sales at all (upon information and belief, Ruby Signs now has its own POS and no longer uses the Center's POS for that purpose).

67.     At least one of the Center's former employees has contacted FASTSIGNS and described defendants' scheme consistent with the allegations in this complaint.

68.     At least one of the Center's former customers has contacted FASTSIGNS and complained about its account being switched to Ruby Signs without the customer's consent.

69.     An investigator recently visited the Center to inquire about a potentially large order. The Center's sales representative disclosed that she worked for the Center and another company with the "same owners" as the Center.

70.     An investigator also visited Ruby Signs and photographed a truck marked with the Ruby Signs name, logo, website, and contact information. The license plate on that truck traced back to Faisal.

71.     A review of the Center's digital storage folder reveals numerous estimates and invoices for Ruby Signs.

72.     Perhaps most damaging is a text message exchange among Faisal and employees of the Center and Ruby Signs. Discussing a potential client, Faisal instructs an employee, "respond from ruby using my name." He continues, "***let her know I own Fastsigns and that handles local jobs, ruby is full scaled nationwide and beyond.***" (emphasis added).

73.     Contemporaneously with filing this lawsuit, FASTSIGNS (i) has issued Franchisee a written notice terminating the Franchise Agreement effective immediately and (ii) filed an arbitration demand with the American Arbitration Association asserting claims against defendants and seeking damages and permanent injunctive relief.

74.     FASTSIGNS at all times fully performed its obligations under the Franchise Agreement.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT (Against All Defendants)**

75.     FASTSIGNS incorporates the above paragraphs as if fully stated in this paragraph.

76.     FASTSIGNS' Trade Secrets and Confidential Information constitute trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3).

77.     FASTSIGNS' Trade Secrets and Confidential Information are related to products and services offered at its franchised centers and by its franchised system, which are used and intended for use in interstate commerce within the meaning of the DTSA, 18 U.S.C. § 1836(b)(1).

78.     FASTSIGNS' Trade Secrets and Confidential Information are not generally known to other persons or the public at large, are not readily ascertainable by other persons by proper means, and generate both actual and potential independent economic benefits and value by virtue of their not being generally known or readily ascertainable to persons who could obtain economic value from the disclosure or use of the information.

79.     FASTSIGNS has taken reasonable steps and has made reasonable efforts to maintain the secrecy and confidentiality of its Trade Secrets and Confidential Information, including storing the information on password-protected computers and network platforms and requiring its franchisees to agree to maintain its confidentiality.

80.     Defendants' actions constitute unlawful, willful, and malicious misappropriation of FASTSIGNS' Trade Secrets and Confidential Information in violation of the DTSA, in that defendants have used and disclosed the Trade Secrets and Confidential Information in the operation of Ruby Signs, with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy.

81.     Under 18 U.S.C. § 1836(b)(3)(A)(i)-(ii), the Court may issue injunctive relief to prevent any actual or threatened trade secret misappropriation and to require affirmative acts to protect trade secrets.

82.     FASTSIGNS is entitled to injunctive relief ordering defendants to cease misappropriating FASTSIGNS' Trade Secrets and Confidential Information. Defendants' actions are causing FASTSIGNS to suffer, and unless enjoined will continue to cause FASTSIGNS to suffer, irreparable harm for which FASTSIGNS has no adequate remedy at law. Unless defendants are ordered to cease their misappropriation, defendants will continue to violate their contractual obligations and FASTSIGNS' Trade Secrets and Confidential Information will remain at risk of mishandling, misuse, and disclosure.

## COUNT II
## TRADE SECRET MISAPPROPRIATION (Against All Defendants)

83.     FASTSIGNS incorporates the earlier paragraphs as if fully stated in this paragraph.

84.     FASTSIGNS' Trade Secrets and Confidential Information constitute trade secrets under the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code § 134A.002(6).

85.     FASTSIGNS' Trade Secrets and Confidential Information are not generally known to other persons or the public at large, are not readily ascertainable by other persons by proper means, and generate both actual and potential independent economic benefits and value by virtue of their not being generally known or readily ascertainable to persons who could obtain economic value from the disclosure or use of the information.

86.     FASTSIGNS has taken reasonable steps and has made reasonable efforts to maintain the secrecy and confidentiality of its Trade Secrets and Confidential Information,

including storing the information on password-protected computers and network platforms and requiring its franchisees and key employees to agree to maintain its confidentiality.

87.     Defendants' actions constitute unlawful, willful, and malicious misappropriation of FASTSIGNS' trade secrets in violation of the TUTSA, in that defendants used and disclosed the Trade Secrets and Confidential Information in the operation of Ruby Signs, with full knowledge that this information was acquired under circumstances giving rise to a duty to maintain its secrecy.

88.     Under Tex. Civ. Prac. & Rem. Code § 134A.003(a) and (c), the Court may issue injunctive relief to prevent any actual or threatened trade secret misappropriation and to require affirmative acts to protect trade secrets.

89.     FASTSIGNS is entitled to injunctive relief ordering defendants to cease misappropriating FASTSIGNS' Trade Secrets and Confidential Information. Defendants' actions are causing FASTSIGNS to suffer, and unless enjoined will continue to cause FASTSIGNS to suffer, irreparable harm for which FASTSIGNS has no adequate remedy at law. Unless defendants are ordered to cease their misappropriation, defendants will continue to violate their contractual obligations and FASTSIGNS' Trade Secrets and Confidential Information will remain at risk of mishandling, misuse, and disclosure.

**COUNT III**
**BREACH OF CONTRACT (Against All Defendants)**

90.     FASTSIGNS incorporates the earlier paragraphs as if fully stated in this paragraph.

91.     The Franchise Agreement and personal guarantee of the Franchise Agreement are valid and enforceable contracts.

92.     Defendants Hassan Brothers and Faisal are signatories to those agreements and therefore undisputably bound by their terms.

17

93.     Defendant Saif, although a nonsignatory, is now a principal of Hassan Brothers and therefore bound by the Franchise Agreement's confidentiality and noncompetition covenants.

94.     Defendant Ruby Signs, although incorporated under Faisal and Saif's mother's name, is actually owned and controlled by Faisal and therefore bound by the Franchise Agreement's and personal guarantee's confidentiality and noncompetition covenants.

95.     Moreover, the nonsignatory parties are officers, agents, servants, and employees of, or other persons who are in active concert and participation with Franchisee and therefore may be enjoined by this Court under Federal Rule of Civil Procedure 65(d).

96.     Defendants' actions constitute material breaches of the Franchise Agreement and personal guarantee, including, without limitation, the confidentiality and noncompetition covenants.

97.     As a direct and proximate result of defendants' continuing breaches of the confidentiality and noncompetition covenants, FASTSIGNS has suffered and will continue to suffer actual, substantial, and irreparable harm, including, without limitation, loss of customer goodwill and loyalty, franchise system instability, lost profits, diminution in the value of its proprietary and confidential information, and loss of competitive advantage.

98.     FASTSIGNS has been and will be irreparably harmed by these actions, and monetary damages are an insufficient remedy in that they cannot fully and adequately compensate FASTSIGNS for the continuing damage to the value of FASTSIGNS' goodwill and reputation, its proprietary and confidential information, and its system stability, all of which is being caused by defendants' continuing material breaches.

99.     Absent preliminary injunctive relief enjoining their misconduct and ordering specific performance of their confidentiality and noncompetition covenants, defendants' material breaches will continue to cause FASTSIGNS irreparable harm.

## COUNT IV
## TORTIOUS INTERFERENCE (Against Saif and Ruby Signs)

100.     FASTSIGNS incorporates the earlier paragraphs as if fully stated in this paragraph.

101.     The Franchise Agreement and personal guarantee of the Franchise Agreement are valid and enforceable contracts.

102.     Defendants Saif and Ruby Signs at all times have been aware that defendants Faisal and Hassan Brothers are bound by their reporting, payment, confidentiality, and noncompetition obligations to FASTSIGNS.

103.     Despite this knowledge, defendants Saif and Ruby Signs have willfully and intentionally interfered with FASTSIGNS' contractual rights by scheming with defendants Faisal and Hassan Brothers to breach their contractual obligations by underreporting sales, misappropriating FASTSIGNS' Trade Secrets and Confidential Information to steal FASTSIGNS' customers, and operating a Competitive Business.

104.     As a direct and proximate result of defendants' tortious interference, FASTSIGNS has suffered and will continue to suffer actual, substantial, and irreparable harm, including, without limitation, loss of customer goodwill and loyalty, franchise system instability, lost profits, diminution in the value of its proprietary and confidential information, and loss of competitive advantage.

105.     FASTSIGNS has been and will be irreparably harmed by these actions, and monetary damages are an insufficient remedy in that they cannot fully and adequately compensate FASTSIGNS for the continuing damage to the value of FASTSIGNS' goodwill and reputation, its

proprietary and confidential information, and its system stability, all of which is being caused by defendants' continuing material breaches.

106.     Absent preliminary injunctive relief enjoining their misconduct, defendants' tortious interference will continue to cause FASTSIGNS irreparable harm.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** FASTSIGNS respectfully prays for judgment in its favor and against defendants, jointly and severally, for the following relief:

A. Preliminary injunctive relief enjoining defendants' further misappropriation of FASTSIGNS' Trade Secrets and Confidential Information;

B. Preliminary injunctive relief ordering defendants, and each of them, and their respective agents, servants, and employees, and all persons in active concert or participation with them, to comply with the noncompetition covenant by (i) ceasing to compete with FASTSIGNS by operating a center that offers the same or similar products and services within fifteen miles of Franchisee's formerly franchised location and within fifteen miles of any other FASTSIGNS® center and (ii) ceasing to divert or attempt to divert any actual or potential business or customers from Franchisee's formerly franchised location;

C. Preliminary injunctive relief enjoining defendants' continuing violations of the confidentiality covenants by ceasing to use any aspect of FASTSIGNS' proprietary system in connection with the operation of a Competitive Business;

D. An award of its costs and expenses, including attorneys' fees, incurred in connection with this action as provided by the Franchise Agreement; and

E. Such other relief as this Court deems just and proper.

Dated:  August 29, 2024                          Respectfully submitted,


                                                 /s/ J. David Apple
                                                 J. David Apple
                                                 LAW OFFICE OF J. DAVID APPLE, PC
                                                 735 Plaza Blvd., Suite 200
                                                 Coppell, Texas 75019
                                                 (972) 315-1900
                                                 jdapple@jdalaw.com

                                                         -and-

                                                 /s/ Aaron-Michael Sapp
                                                 Aaron-Michael Sapp (*pro hac forthcoming*)
                                                 Max DeLeon (*pro hac forthcoming*)
                                                 CHENG COHEN LLC
                                                 363 West Erie Street, Suite 500
                                                 Chicago, Illinois 60654
                                                 312-243-1725
                                                 asapp@chengcohen.com
                                                 max.deleon@chengcohen.com